IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| KEVIN TUCKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:11-CV-04134-NKL |
| ) | |
| MISSOURI DEPARTMENT OF SOCIAL ) | |
| SERVICES, JUDY PARRETT, TISA ) | |
| ERVIN, and TIMOTHY DECKER, ) | |
| ) | |
| Defendants. ) | |

**ORDER**

Defendants Missouri Department of Social Services, Judy Parrett, Tisa Ervin, and Timothy Decker move for summary judgment on Plaintiff Kevin Tucker's discrimination and retaliation claims [Doc. # 39]. For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

**I.  Uncontested Facts**

Tucker was employed as a Youth Specialist with the Missouri Department of Social Services, Division of Youth Services ("DYS"), from September 1, 2009 to July 2, 2010. Decker is the Director of DYS, Parrett is the Human Resources Manager for DYS, and Ervin is Facility Manager II for DYS. DYS is responsible for the care and treatment of delinquent youth committed to its custody by Missouri's juvenile courts.

Tucker worked at the DYS Hogan Street Regional Youth Center ("Hogan Street), which is classified as a secure care center. This is the highest security classification,

1

meaning Hogan Street houses youths considered to be the highest risk offenders. As a Youth Specialist, Tucker was responsible for ensuring the safety and security of the Hogan Street facility. Missouri law requires DYS to have a minimum number of Youth Specialists present at each facility at any given time, based on the number of youths housed at the facility. Youth Specialists rotate between working three shifts in order to maintain the required number of Youth Specialists at each facility twenty-four hours a day. There is an 8:00 a.m. to 4:00 p.m. shift, a 4:00 p.m. to midnight shift, and a midnight to 8:00 a.m. shift.

Prior to interviewing for the position as a Youth Specialist, Tucker completed a form DYS uses to determine an applicant's eligibility. In this form, Tucker indicated that he was able to work nights. While interviewing for the position, Tucker was told that he had to be able to work all three shifts. Tucker understood that Youth Specialists were expected to be able to work all shifts. Tucker also understood that he was required to remain alert during each shift and that DYS policy prohibited employees from sleeping while on duty. During Tucker's employment with DYS, he worked all three shifts.

On January 5, 2010, Tucker was caught sleeping while on duty. As required by DYS policy, Tucker received a five-day suspension for this incident. Tucker received a suspension letter, which stated, "Future conduct of a similar nature shall be grounds for further disciplinary action, up to and including dismissal." On June 6, 2010, Tucker was again caught sleeping while on duty. As a result, Ervin submitted a request for discipline recommending that Tucker be dismissed due to this second incident of sleeping while on

2

duty. At some point, the exact timing is in dispute, Tucker reported that a medication he took for migraines was making him drowsy and causing his problems at work.

On June 17, 2010, Tucker submitted a Critical Incident Report, in which he claimed he was injured while attempting to restrain a youth. A few days later, Tucker filled out paperwork for a worker's compensation claim based on this incident.

DYS terminated Tucker on June 22, 2010. The termination letter cited Tucker's incidents of sleeping on duty as the reason for his discharge. Tucker subsequently filed a *pro se* complaint, claiming violations of the Americans with Disability Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.*, and Missouri Revised Statute section 287.780, which provides a civil cause of action for employees who are discharged in retaliation for exercising their rights under Missouri's workers' compensation laws.

## II. Discussion

### A. Summary Judgment Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, the Court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable

inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir.1991) (citation omitted).

### B. Tucker's ADEA and Retaliation Claims

Tucker made no attempt to respond to the litany of arguments Defendants advanced in support of their motion for summary judgment on these claims. Other than the bare allegations in Tucker's complaint, there is no evidence that Tucker's age or claim for worker's compensation played any role in the decision to terminate Tucker. Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) ("In order to withstand the motion for summary judgment, [the plaintiff] must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." (quotations and alterations omitted)). There is no genuine issue as to any material fact where the non-moving party completely fails to offer "proof concerning an essential element of the nonmoving party's case." *Celotex*, 477 U.S. at 322-23. Thus, summary judgment is appropriate with respect to these claims.

### C. Tucker's ADA Claim

As there is no direct evidence of discrimination, Tucker's ADA claim is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010) (quoting *Rehrs v. Iams Co.*,

4

486 F.3d 353, 356 (8th Cir. 2007)). Under this framework, the plaintiff first "bears the burden of establishing a prima facie case." *Id.* To meet this requirement, the plaintiff must show, among other things, that "he . . . was qualified, with or without a reasonable accommodation, to perform the essential job functions of the position in question." *Id.* If the plaintiff succeeds, "[t]he burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's actions." *Id.* If the employer provides such a reason, the burden shifts back to the plaintiff to show that the stated justification is a pretext. *Id.*

Defendants argue that Tucker has not made a prima facie case because he cannot show that he had the ability to perform the essential job functions of a Youth Specialist, with or without a reasonable accommodation. In particular, Defendants claim that the ability to work and maintain alertness during all three shifts, including the overnight shift, are essential functions of the Youth Specialist position. Tucker cannot and does not claim that maintaining alertness was not an essential function of the Youth Specialist position. Thus, the only issue is whether the ability to work all three shifts was an essential function.

On this point, Tucker first suggests that he substantially performed this function because there were only two documented instances where he was caught sleeping on duty. Alternatively, Tucker argues that working all three shifts was not an essential function of the Youth Specialist position. As such, Tucker maintains that he was capable of performing this job with the reasonable accommodation that he not be asked to work the overnight shift.

5

Regarding Tucker's first claim, only some nonperformance is not the same as performance. Tucker's position involved supervising the highest risk juvenile offenders housed by DYS. [Doc. # 39-4 at 2]. Consequently, any inability to maintain alertness during a shift was cause for concern. To this end, DYS policy "absolutely prohibited" sleeping on duty and provided for a minimum five-day suspension without pay for a first offense. [Doc. # 39-5 at 7-8]. In addition, Tucker submitted a work accommodation request, in which he asked to be removed from the overnight shift. [Doc. # 39-15 at 5]. This request shows that Tucker himself did not feel he was capable of working this shift. Based on the two incidents where Tucker was caught sleeping on duty and Tucker's subsequent request for a shift change, no reasonable juror could find that Tucker was able to work and maintain alertness throughout all three shifts.

Since Tucker cannot show that he was capable of working the overnight shift, the dispositive issue is whether working this shift is an essential function of a DYS Youth Specialist. The ADA does not require an employer to "reallocate or eliminate the essential functions of a job to accommodate a disabled employee." *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 950 (8th Cir. 1999). Thus, if working all three shifts is an essential function, Tucker's claim that DYS should have accommodated his disability by removing him from the overnight shift fails as a matter of law.

### 1. Whether Working All Three Shifts Was an "Essential Function" of the YS Position

Tucker argues that whether the ability to work all three shifts is an essential function of a Youth Specialist presents a disputed issue of material fact. Defendants bear

6

Case 2:11-cv-04134-NKL   Document 50   Filed 12/10/12   Page 6 of 11

the burden of showing that a particular job function is an essential function of the job. *See Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007). "Essential functions are the fundamental job duties but not the marginal functions of a particular job." *Id.* This term "encompasses more than core job requirements," however, and "may include scheduling flexibility." *Id.*

> Evidence of whether a particular function is essential includes, . . . the employer's judgment as to which functions are essential; [] written job descriptions prepared before advertising or interviewing applicants for the job; [] the consequences of not requiring the incumbent to perform the function; and [] the current work experience of incumbents in similar jobs.

*Id.* Of these factors, the employer's judgment in particular "is considered highly probative." *Duello v. Buchannan Cnty. Bd. of Supervisors*, 628 F.3d 968, 972 (8th Cir. 2010) (quotation omitted).

The record shows that DYS considers the ability to work all shifts an essential function of a Youth Specialist. Prior to interviewing for the position, DYS had Tucker complete a questionnaire designed to "determine [his] eligibility." *See* [Doc. # 39-7]. In this form, Tucker was asked whether he was "able to work nights," and Tucker indicated that he was. [Doc. # 39-7]. Tucker stated in his deposition that he was told and understood that Youth Specialists were required to work all three shifts. [Doc. # 39-5 at 2]. Tucker also admitted that other DYS employees worked all three shifts. [Doc. # 39-5 at 131]. Thus, at least three of the four factors set out above weigh in favor of finding that working all three shifts is an essential function of this position.

Defendants also claim that if DYS employees were not required to work all shifts, then DYS might not have enough employees to cover all shifts, as required by law, or may have to hire additional employees. Tucker responds that these alleged consequences are purely speculative. But there is no question that removing Tucker from the overnight shift would have required the other Youth Specialists to take his share of these shifts. Such an accommodation is not required by the ADA. *See Rehrs*, 486 F.3d at 357 (permitting the plaintiff "to work a straight day-shift schedule would have placed a heavier or unfavorable burden on other technicians at the facility" and was "not mandated [under the ADA].").

In addition, the record shows that, when making a schedule, DYS must take into account the various levels of experience of staff members and the evolving dynamics of the youths at a given facility. [Doc. # 39-4 at 2]. In some instances, more experienced staff must be assigned to work with a particular group of youths during a particular time of day to address developing issues. [Doc. # 39-4 at 2]. Scheduling flexibility was thus necessary to meet this demand, while still ensuring that each facility always maintained sufficient staff to supervise the youths during all three shifts.

In response to the evidence presented by Defendants, Tucker has not offered any evidence that might support a contrary conclusion. There is no evidence that any other DYS employee was ever permanently, or even temporarily, removed from the overnight shift, or that DYS ever agreed to hire any person who was not able to work this shift. In fact, the eligibility checklist Tucker completed prior to his interview, in which he

8

indicated that he was able to work nights, stated that any "failing response" was grounds for terminating the interview process. [Doc. # 39-7].

Furthermore, Tucker has not presented any admissible evidence of disparate treatment among DYS employees that might suggest the shift rotation and alertness requirements were discriminatorily applied. In ruling on a summary judgment motion, the Court "must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be *admissible at trial*." *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) (quotation omitted) (emphasis added). Where there is a question about the admissibility of cited materials, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Advisory Committee Notes to Fed. R. Civ. P. 56(c)(2).

In an attempt to show disparate treatment, Tucker submitted his own affidavit and an affidavit from Odis Williams, another Youth Specialist who worked with Tucker. Each states that Carrie Robinson, a Youth Specialist, was suspended twice for sleeping on duty, as opposed to being dismissed after the second incident like Tucker. [Doc. # 47-1 at 4]; [Doc. # 47-2 at 3]. First of all, this does not suggest that Robinson was ever excused from working the overnight shift, which is the relief Tucker seeks. In addition, neither affiant provides any foundation for this allegation. As the proponent of this evidence, it is Tucker's burden to establish the personal knowledge of the affiants or, if the testimony is hearsay, an exception to the hearsay rule. *See* Advisory Committee Notes to Fed. R. Civ. P. 56(c)(2); *see also United States v. Shields*, 497 F.3d 789, 793

9

(8th Cir. 2007).  Instead, Tucker cites the conclusory statements in the affidavits as fact, without any explanation as to how either affiant learned about Robinson's suspensions or how this testimony might be admissible at trial.

By contrast, Defendants cite the affidavit of Parrett, who, by virtue of her position as Human Resources Manager for DYS, was directly in charge of tracking all disciplinary matters [Doc. # 49-2 at 1], and is thus competent to testify on this topic.  Parrett avers that Robinson was only disciplined once for sleeping on the job.  [Doc. # 49-2 at 1]. Parrett also avers that neither Tucker nor Williams ever supervised Robinson, filled out witness statements related to Robinson's sleeping incident, or were otherwise involved in disciplining employees or tracking employee discipline.  [Doc. # 49-2 at 2].  In addition, Ervin, Facility Manager II for DYS, states that another DYS employee, Bridgette Hooks, was terminated for sleeping on the job.  [Doc. # 39-6 at 2].  There is no evidence that Hooks had a disability.  This further undermines Tucker's claim that he was fired because of his disability, as opposed to the incidents where he was discovered sleeping at work.

In light of this competent and admissible evidence, the unsupported allegations contained in the affidavits of Tucker and Williams do not raise a genuine issue for trial as to Tucker's allegation of disparate treatment.  *See Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006) ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits."); *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.").

Consequently, this case is nearly indistinguishable from *Rehrs*, in which the Eight Circuit held that "a generally applicable requirement" that all employees in the plaintiff's position rotate shifts "was not discriminatory." *Rehrs*, 486 F.3d at 358. Under *Rehrs*, Tucker's claim that Defendants failed to reasonably accommodate his disability fails because DYS was not required to eliminate an essential function of the Youth Specialist position to accommodate Tucker. *See id.* As such, Tucker has not established a prima facie case of disability discrimination and Defendants are entitled to summary judgment on this claim.

## III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment [Doc. # 39] is GRANTED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: December 10, 2012
Jefferson City, Missouri